CA NO. 22-50179

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | DC NO. CR 20-00447-MWF |
| Plaintiff-Appellee, | |
| v. | |
| JESSE LUCAS BELTRAN, | |
| Defendant-Appellant. | |

---

**APPELLANT'S OPENING BRIEF**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE MICHAEL W. FITZGERALD
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
SAMUEL O. CROSS
Deputy Federal Public Defender
411 West Fourth St. Suite 7110
Santa Ana, CA 92701
Telephone: (714) 338-4500
Facsimile: (714) 338-4520
Email: sam_cross@fd.org

Attorneys for Defendant-Appellant

## TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ...........................................................................1

II.  QUESTIONS PRESENTED ...........................................................1

III. STATEMENT OF ADDENDUM ....................................................2

IV.  STATEMENT OF JURISDICTION AND CUSTODY STATUS ................2

V.   STATEMENT OF THE CASE .......................................................3

    A.   LAPD Dispatch Receives a 911 Call Describing a Domestic
        Incident in Canoga Park; Officers Search for Suspects ........................4

    B.   Officers See, Grab, and Handcuff Mr. Beltran ....................................7

    C.   Mr. Beltran is Indicted for Being a Prohibited Person in
        Possession of a Firearm and Ammunition ...........................................9

    D.   Mr. Beltran Moves to Suppress Evidence Gathered from the
        Illegal Search and Seizure, and the Court Denies the Motion After
        a Brief Evidentiary Hearing ...................................................9

VI.  SUMMARY OF ARGUMENT ....................................................12

VII. ARGUMENT ...........................................................................13

    A.   The Officers' Aggressive Handcuffing of Mr. Beltran Amounted
        to a Full-Blown Arrest Without Probable Cause ...............................14

        1.   An Arrest Occurs when the Person Seized Would Not Feel
            Free to Leave and That Continued Custodial Detention is
            Inevitable ...............................................................15

        2.   Officers' Initial Seizure of Mr. Beltran's Person was an
            Arrest ......................................................................17

        3.   The Arrest Was Illegal Because It Lacked Probable Cause .....22

i

# TABLE OF CONTENTS

**Page(s)**

B.  The Officers' Seizure and Subsequent Search of Mr. Beltran Was Conducted Without Requisite Reasonable Suspicion or Officer Safety Concern Under *Terry v. Ohio* ................................................. 23

    1.  The Officers Lacked Reasonable Suspicion to Seize and Handcuff Mr. Beltran. ............................................... 24

    2.  Officers Were Not Justified in Conducting a *Terry* Frisk, Pat-Down, Or Search Based on Officer Safety Concerns ........ 27

C.  Officer Tulagan's Questioning About Whether Mr. Beltran Was On Probation or Parole Exceeded The Permissible Scope of The Investigation and Illegally Prolonged the Seizure ............................. 31

D.  Mr. Beltran's "Yes" Answer to the Question Whether He was On Probation or Parole was Insufficient Basis for Police To Conduct a Reasonable Search On the Belief He Had Waived His Fourth Amendment Rights ............................................................................. 33

VIII. CONCLUSION ............................................................................. 37

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Alabama v. White,*
  496 U.S. 325 (1990).................................................................24, 25

*Allen v. City of Los Angeles,*
  66 F.3d 1052 (9th Cir. 1995) ...............................................21

*Allen v. City of Portland,*
  73 F.3d 232 (9th Cir. 1996) ...............................................16

*Arizona v. Johnson,*
  555 U.S. 323 (2009).................................................................24, 25

*Brown v. United States,*
  590 A. 2d 1008 (D.C. Cir. 1991) .........................................26

*Florida v. J.L.,*
  529 U.S. 266 (2000).................................................................25

*Green v. City and County of San Francisco,*
  751 F.3d 1039 (9th Cir. 2014) .............................................15

*Illinois v. Caballes,*
  543 U.S. 405 (2005).................................................................31

*Kraus v. County of Pierce,*
  793 F.2d 1105 (9th Cir. 1986) .............................................15

*Navarette v. California,*
  572 U.S. 399–400 (2014).......................................................26

*Rodriguez v. United States,*
  575 U.S. 348 (2015).................................................................31, 32

*Terry v. Ohio,*
  392 U.S. 1 (1968)...............................................................*passim*

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Thomas v. Dillard*,
    818 F.3d 864 (9th Cir. 2016) ........................................................23, 28, 29, 30

*United States v. Arvizu*,
    534 U.S. 266 (2002) ...................................................................................24

*United States v. Bautista*,
    684 F.2d 1286 (9th Cir. 1982) .....................................................................24

*United States v. Bravo*,
    295 F.3d 1002 (9th Cir. 2002) .....................................................................18

*United States v. Caseres*,
    533 F.3d 1064 (9th Cir. 2008) ................................................................34, 36

*United States v. Del Vizo*,
    918 F.2d 821 (9th Cir. 1990) .......................................................................17

*United States v. Delgadillo–Velasquez*,
    856 F.2d 1292 (9th Cir.1988) ......................................................................27

*United States v. Evans*,
    786 F.3d 779 (9th Cir. 2015) .......................................................................32

*United States v. Flatter*,
    456 F.3d 1154 (9th Cir. 2006) .....................................................................13

*United States v. Garcia*,
    974 F.3d 1071 (9th Cir. 2020) ................................................................34, 36

*United States v. Gonzales*,
    749 F.2d 1329 (9th Cir.1984) ......................................................................22

*United States v. Guzman-Padilla*,
    573 F.3d 865 (9th Cir. 2009) ..................................................................15, 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States v. I.E.V.*,
   705 F.3d 430 (9th Cir. 2012) (*Terry* frisk was not justified where
   defendant had been removed from car where drug dog alerted) ........................30

*United States v. Job*,
   871 F.3d 852 (9th Cir. 2017) ................................................................34

*United States v. Johnson*,
   256 F.3d 895 (9th Cir. 2001) ................................................................22

*United States v. Landeros*,
   913 F.3d 862 (9th Cir. 2019) ..........................................................32, 33

*United States v. Lara*,
   815 F.3d 605 (9th Cir. 2016) ...................................................14, 35, 36

*United States v. Lee*,
   699 F.2d 466 (9th Cir.1982) (per curiam) ...........................................18

*United States v. Manzo-Jurado*,
   457 F.3d 928 (9th Cir. 2006) ................................................................14

*United States v. Ricardo D.*,
   912 F.2d 337 (9th Cir. 1990) ................................................................15

*United States v. Robertson*,
   833 F.2d 777 (9th Cir. 1987) ................................................................15

*United States v. Scott*,
   450 F.3d 863 (9th Cir. 2006) ................................................................34

*United States v. Scott*,
   705 F.3d 410 (9th Cir. 2012) ................................................................20

*United States v. Thomas*,
   863 F.2d 622 (9th Cir.1988) ................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Thompson*,
    906 F.2d 1292 (8th Cir. 1990) ............................................................21

*United States v. Torres*,
    995 F.3d 695 (9th Cir. 2021) ...............................................................10

*United States v. Torres-Sanchez*,
    83 F.3d 1123 (9th Cir. 1996) ...............................................................14

*United States v. Washington*,
    387 F.3d 1060 (9th Cir. 2004) .............................................................14

*United States v. Williams*,
    846 F.3d 303 (9th Cir. 2016) ...............................................................24

*Washington v. Lambert*,
    98 F.3d 1181 (9th Cir. 1996) .......................................15, 16, 19, 21

*Wong Sun v. United States*,
    371 U.S. 471 (1963).............................................................................28

**Statutes**

18 U.S.C. § 922(g)(1)...................................................................................3, 9

18 U.S.C. § 3142(g)(2)....................................................................................10

18 U.S.C. § 3231 ...............................................................................................2

28 U.S.C. § 1291 ...............................................................................................3

**Other Authorities**

U.S. Const. amend. IV ...............................................................*passim*

Fed. R. App. P. 4(b)(1)(A)(i) ..........................................................................3

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Other Authorities**

Rule 28-2.7 .............................................................................................................2

# I.   INTRODUCTION

Mr. Beltran and his girlfriend were peacefully shopping at a Food 4 Less in Los Angeles, California when they were approached by two Los Angeles Police Department ("LAPD") officers investigating a domestic violence report. Though the report had described a man and a woman, it only roughly approximated Mr. Beltran's and his girlfriend's appearance. After delivering a casual greeting, the officers abruptly grabbed Mr. Beltran's arms while warning him that if he fought he was "gonna get dropped, you're gonna get tased, you're gonna get seriously hurt, you're gonna get charged with resisting." They then handcuffed Mr. Beltran, asked him if he was on probation or parole, and—after he admitted he was on probation or parole and had a gun—searched and arrested him, all without having observed any illegal conduct.

Because the officers lacked probable cause—or even reasonable suspicion— to arrest or detain and search Mr. Beltran, his seizure violated the Fourth Amendment and the district court should have suppressed the resulting evidence. This Court should reverse the district court's denial of Mr. Beltran's suppression motion and permit him to withdraw his guilty plea made through a conditional plea agreement.

## II.   QUESTIONS PRESENTED

1.     Whether the police officers who seized and searched Mr. Beltran conducted an arrest unsupported by probable cause.

2.     Whether, in the alternative, the officers conducted an investigative seizure or protective search under *Terry v. Ohio*, 392 U.S. 1 (1968), that was unsupported by reasonable suspicion.

3.     Whether, under the second scenario, the officers exceeded the scope of a permissible investigatory stop by unnecessarily prolonging the detention of Mr. Beltran by inquiring into his probation or parole status.

4.     Whether the information officers gathered about Mr. Beltran's probation or parole status was sufficient to authorize their ensuing search of Mr. Beltran's person, based on Mr. Beltran's purported prior waiver of his Fourth Amendment rights due to his probation or parole status?

## III.  STATEMENT OF ADDENDUM

Pursuant to Circuit Rule 28-2.7, an addendum setting forth the constitutional provisions and statutes relevant to this appeal has been filed concurrently with this brief.  Ninth Cir. Rule 28-2.7.

## IV.  STATEMENT OF JURISDICTION AND CUSTODY STATUS

The Honorable Michael W. Fitzgerald of the United States District Court for the Central District of California had jurisdiction over the United States' federal criminal charges against Mr. Beltran pursuant to 18 U.S.C. § 3231.  Mr. Beltran appeals from the district court's February 14, 2022, order denying his motion to suppress evidence seized by LAPD officers who arrested and searched him.  (ER-

37.)[1]  On May 6, 2022, Mr. Beltran entered a conditional guilty plea to the single-count indictment charging him with possession of a firearm and ammunition as a felon in violation of 18 U.S.C. § 922(g)(1).  (ER-16, 18.)  Mr. Beltran's plea agreement reserved the right to seek review from this Court of the district court's denial of the motion to suppress.  (ER 18.)  On August 8, 2022, the district court sentenced Mr. Beltran to time served for a single count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  (ER 5, 10, 15.)  Judgment was entered August 11, 2023, with a second, amended judgment requiring a 365-day period of home detention entered the same day.  (ER-5, 10.)  *See* Fed. R. App. P. 4(b)(1)(A)(i).  Mr. Beltran timely filed a notice of appeal on August 16, 2022.  (ER 287.)  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

Mr. Beltran is currently out of custody and serving a term of supervised release under the supervision of the United States Probation Office for the Central District of California.

## V.  STATEMENT OF THE CASE

Two LAPD officers arrested and searched Mr. Beltran at a Food 4 Less grocery store in the Canoga Park neighborhood of Los Angeles, finding a loaded

---

[1] "ER-xx" refers to the "ER" page numbers on the lower right corners of the pages of the Excerpts of Record submitted concurrently with this Opening Brief.

gun in his waistband and an extra magazine containing ammunition in his backpack.  The district court conducted a short evidentiary hearing at which one officer testified about the incident, which was captured on the officers' body-worn cameras and submitted to the district court.[2]  The district court later denied the motion.

## A.  LAPD Dispatch Receives a 911 Call Describing a Domestic Incident in Canoga Park; Officers Search for Suspects

On July 11, 2020, at about 6:52 p.m., a person called 911 to report a man hitting a woman who was "completely bloodied," in the Canoga Park neighborhood of Los Angeles.[3]  (ER-226.)  The caller initially said the couple was

---

[2] The body-worn camera footage consists of four video recordings, which were filed in the district court as exhibits A-1, A-2, B-1, and B-2 to Mr. Beltran's motion to suppress.  (District Court Docket Nos. 20-1.)  A-1 and A-2 contain Officer Tulagan's body-worn camera footage and B-1 and B-2 contain Officer Brants's footage.  Mr. Beltran has filed, concurrently with this brief, a motion to submit those video recordings to this Court as a physical exhibit. Throughout this brief, A-1 is cited as "Tulagan Cam" and B-1 is cited as "Brants Cam."  (Although A-2 and B-2 are included for completeness, they are not cited herein, because they cover events that occurred after the search and seizure at issue on appeal.) Citations to specific portions of those recordings are made to individual timestamps within the recordings as elapsed times; i.e., not with reference to the time displayed in the upper right corner of the video recording itself, but by referring to the minutes and seconds elapsed while the video plays, as displayed by any accurate video playback software used to view the recordings.  The timestamps displayed within the recordings themselves agree neither with each other nor with the actual time of day.

[3] Citations to the record that quote the caller refer to the government's written translation of the caller, who spoke Spanish with the dispatcher.

on Saticoy and Mason streets in front of a building. *Id.* The caller identified the man as white and the woman as Hispanic, and stated that the man was bald, about 24 years old, and wearing a striped shirt and shorts. (ER-220.) The caller reported the woman was wearing a dress with shorts. (ER-221.) He then reported that the couple was walking towards Oso, another street. *Id.* Finally, he stated again that the woman had blood on her nose. *Id.*

The 911 dispatcher relayed to LAPD units in the area that a battery was occurring near Saticoy and Mason, and that the suspect was male, white, bald, approximately 24 years old, wearing a dark shirt and shorts, and assaulting a Hispanic female wearing a dress. (ER-222.) LAPD officers Peter Tulagan and Brandon Brants received the call and responded by driving to the area. Tulagan Cam 0:00–9:30. The 911 dispatcher then called the 911 caller back, and the caller described the couple moving down the street together, going toward Oso and Saticoy streets, and then walking toward the Food 4 Less grocery store. (ER-231.) The caller then stated that he could not see the couple anymore, but had seen them in the Food 4 Less parking lot, and that he believed they had entered the Food 4 Less, adding that the man's shirt was grey and he was carrying a black backpack. (ER-232.) The caller indicated that he could see the officers. (ER-233.) The dispatcher updated officers that the suspect was wearing "a grey shirt, carrying a black bag." Tulagan Cam 5:42–5:50. The caller at no point explained who he

5

was, how he had come to observe and follow the couple, or where he was observing them from.

Meanwhile, the officers did not immediately enter the Food 4 Less store; instead, they spent about seven and a half minutes walking around the parking lot outside the Food 4 Less and inside a few stores.  Tulagan Cam 9:32–17:00.  At one point during this time period, Officer Tulagan communicated with a man standing in the parking lot, asking him, "Did you call us?", to which the man responded indistinctly.  *Id.* at 11:40–11:50.  Because Officer Tulagan was training Officer Brants that day,  Tulagan provided a running stream of commentary and advice regarding the purpose and nature of the investigation.  *See, e.g.*, *id.* at 12:00–12:10.

At a certain point, an unidentified person approached the officers and stated that "they are inside the Food 4 Less in the soda aisle."[4]  Tulagan Cam 16:30–16:35.  After canvassing a few other businesses, the police got back in their car and drove to the Food 4 Less across the parking lot.  *Id.* at 17:07–18:40.  During this drive, Tulagan provided instructions to Brants about what he should do when they effectuated the stop, including "Handcuff him immediately," *id.* at 17:20–17:22, and "Slowly, I'm gonna make my way around him, okay, then when I make my

---

[4] This person does not appear to have been the caller, who described himself as wearing "a full grey shirt and sandals."  (ER-235.)  By contrast, the person who walked up to the officers was wearing a white or grey Dodgers t-shirt and black-and-white sneakers.

way around him, and I put hands on, you're gonna jump on him with me, we're gonna put handcuffs on him, it's easier for two people to control than one." *id.* at 17:32–17:45. The officers then entered the Food 4 Less. *Id.* at 18:48–18:52.

## B. Officers See, Grab, and Handcuff Mr. Beltran

Inside the Food 4 Less, Officer Tulagan continued his running advice to Officer Brants, saying "If he fights, I'm gonna say backup." Tulagan Cam 19:10–19:14. As the officers walked toward the back of the store, Tulagan told Brants to "Expect the worst, watch his hands, watch his waistband, got it? And if we have to get into a shooting, watch your background. Watch. Your. Background!" *Id.* at 19:44–19:58.

The officers approached Mr. Beltran, who was shopping with Ms. Salvador next to a freezer cabinet at the back of the store (not in the soda aisle, as the person outside had indicated). Tulagan Cam 19:58–20:13; Brants Cam 18:43–18:55. Ms. Salvador was seated in a motorized shopping cart. *Id.* Mr. Beltran had his hands on the front of the shopping cart, standing in front of the cart and on the opposite side of the cart from Ms. Salvador. *Id.* Ms. Salvador was wearing a single garment, blue-and-white patterned, which appears to be a dress or single garment with shorts-legs. *Id.* Mr. Beltran was wearing a grey t-shirt with graphic logos, and grey or grey-plaid shorts, and carrying a backpack. *Id.* Whereas the caller had described the suspect's backpack as black, Mr. Beltran's backpack was grey. *Id.* Both Mr. Beltran and Ms. Salvador wore cloth face coverings. *Id.* The two were

not interacting physically or yelling at each other. *Id.* No blood was visible anywhere on either Mr. Beltran or Ms. Salvador. *Id.*

Brants and Tulagan approached Mr. Beltran in a pincer formation, with Brants moving in from the front and Tulagan from the rear. *Id.* Brants said: "Can I talk to you for a little bit? How you doing today? All right, so, there's two sides to every story, we got a call for a domestic?" Brants Cam 18:50–18:54. Mr. Beltran stated: "No." *Id.* Brants responded: "There's no domestic?" *Id.* Meanwhile, Officer Tulagan said: "We're just gonna pat you down, is that cool, just to make sure you got nothing on you?," while walking up behind Mr. Beltran and—without waiting for Mr. Beltran to reply—grabbing his wrists from around the back of his waist. *Id.* at 18:55–19:00.

Tulagan then directed Brants to "partner up," by which he meant assist in grabbing Mr. Beltran's wrists so that he could be handcuffed. Brants Cam 19:00–19:05. Officer Tulagan then yelled at Mr. Beltran from close range that the officers would "let you go, if it's not you," but:

> If you fight, you're gonna get dropped, you're gonna get tased, you're gonna get seriously hurt, you're gonna get charged with resisting. So even if you didn't do anything, if you resist, you'll get a charge of resisting. But if you did nothing, we're gonna let these handcuffs go. If she says nothing happened, nothing happened, but if you fight us, you are going to lose. Do you understand? I don't wanna fight you, I don't wanna hurt you, but it's gonna happen. You're gonna get tased, you're gonna go to jail, and you might go to prison. Don't fight me. Let me do my job. Is that clear?

8

Tulagan Cam 20:25–21:00.  The officers then pulled Mr. Beltran's hands behind his back and handcuffed him.  *Id.* at 21:01–21:15.

Officer Tulagan asked Mr. Beltran if he was on probation or parole. Tulagan Cam 21:15–21:30.  Mr. Beltran then stated "yes" and that the probation or parole was for "a gun."  *Id.*  Mr. Beltran then told officers he had a gun in his waistband.  *Id.*  Officers searched, seized, and arrested him, finding a loaded gun in his waistband and a magazine with more ammunition in his backpack.  (ER-242.) When interviewed by police, Ms. Salvador stated that the two had argued but that Mr. Beltran had never hit her.  *Id.*  She had no markings or bruising on her body. *Id.*  Mr. Beltran was not charged with domestic violence or any other assault.  *Id.*

## C.    Mr. Beltran is Indicted for Being a Prohibited Person in Possession of a Firearm and Ammunition

Mr. Beltran was charged in a single-count Indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), based upon the firearm and ammunition found in his waistband and the ammunition found in his backpack.  (ER 283.)  The Indictment also included a forfeiture allegation.  *Id.*

## D.    Mr. Beltran Moves to Suppress Evidence Gathered from the Illegal Search and Seizure, and the Court Denies the Motion After a Brief Evidentiary Hearing

Mr. Beltran moved to suppress the gun and ammunition, arguing that the initial seizure of his person and subsequent search constituted an arrest without probable cause; and that even if the search and seizure were merely investigative

under *Terry v. Ohio*, they were unsupported by specific, articulable facts amounting to reasonable suspicion.  (ER 264.)  Finally, Mr. Beltran argued that Officer Tulagan's questioning regarding probation or parole constituted an unconstitutional prolongation of the stop.  (ER 270.)  The government opposed the suppression, arguing that the officers' search and seizure did not amount to arrest, that both the search and seizure were authorized by reasonable suspicion, and that the investigation was not unreasonably prolonged.  (ER 184.)

The district court conducted an initial hearing on the motion to suppress at which no evidence was taken, but at which the district court questioned the parties as to whether an evidentiary hearing was required.  (ER 127, 128.)  The district court later held another non-evidentiary hearing on suppression (ER-103), then issued an order stating that "[d]efendant has raised credible issues concerning the constitutionality of the stop and arrest, in particular the putative *Terry* frisk," and scheduled another hearing that was "not yet an evidentiary hearing."  (ER-102.)[5] Both parties then submitted supplemental briefing on the specific question of

---

[5] This order also "invite[d] counsel for Defendant to apply for Defendant's release" from pretrial custody based upon "the changed circumstances of the strength of the evidence, 18 U.S.C. § 3142(g)(2), and pursuant to *United States v. Torres*, 995 F.3d 695, 708 (9th Cir. 2021)," (ER-102), which Mr. Beltran did via stipulation, and which the district court granted.  (ER-96, 99.)  The circumstances referred to appear to concern the order's suggestion that the district court was tentatively considering granting the motion to suppress.  *Torres*, as cited, concerns excessive pretrial detention as a potential due-process violation.

whether the officers' search of Mr. Beltran, if a so-called "*Terry* frisk," had been justified by reasonable suspicion. (ER-79, 84.) The Court conducted another hearing at which evidence was ultimately briefly taken, in the form of Officer Tulagan's testimony about the arrest.

Officer Tulagan adopted the affidavit he had submitted with the government's response to the motion to suppress, and testified that he typically, "[w]hen I'm conducting a criminal investigation," asks suspects whether they are on probation or parole. (ER-67.) The district court took the matter under advisement.

At a later hearing the district court ruled orally on the motion to suppress, denying it in its entirety.[6] The district court explained 1) that it credited Officer Tulagan's testimony that he always asks suspects whether they are on probation or parole; 2) that there was reasonable suspicion to conduct a *Terry* stop, without reaching the question of whether a search or frisk was justified under *Terry*; and 3) that "once that stop occurred, then the question was going to be put to Mr. Beltran whether there -- he had that status, and whether he had any guns on him." (ER-40.) The district court thus reasoned that because Mr. Beltran had stated, in

---

[6] Although the district court indicated that it "[would] try to get something in writing," i.e., a written order denying suppression, only a minute entry followed, with no further written order from the district court. (ER-36.) The district court's ruling was thus only issued orally.

11

response to Officer Tulagan's questioning, that he had a gun, search for and seizure of the gun was warranted and did not violate the Fourth Amendment. (ER-40.) The district court did not reach the question of whether the search had been justified by probable cause or reasonable suspicion predating Mr. Beltran's statement that he had a gun.

## VI.  SUMMARY OF ARGUMENT

The district court erred in denying the motion to suppress the firearm and ammunition.

The LAPD officers' actions when they encountered Mr. Beltran amounted to arrest. The officers employed intrusive measures, including both officers physically restraining Mr. Beltran, yelling threats at him while doing so, and placing him in handcuffs. This arrest was conducted only on the basis of a general description given by a witness whom the arresting officers had not interviewed. The officers' own observations on the scene, which differed in important respects from the call details, did nothing to substantiate the notion that Mr. Beltran and Ms. Salvador were the people the caller described—or even that a domestic violence incident had occurred at all. The arrest was thus conducted without probable cause.

Even if the officers' actions prior to searching Mr. Beltran did not amount to an arrest, officers certainly conducted an investigative search and seizure of Mr. Beltran's person under *Terry*. A brief investigative seizure was not warranted by

the generalized information then in officers' possession—information that, again, failed to match Mr. Beltran and Ms. Salvador in key respects. Even if a brief seizure was authorized, there was an insufficient basis in concern for officer safety to authorize a search of Mr. Beltran's person.

And even assuming the Terry stop was justified by reasonable suspicion at the outset (which it was not), Officer Tulagan's subsequent question about Mr. Beltran's probation or parole status unreasonably prolonged that seizure—rendering it unconstitutional—because it was unrelated to the seizure's mission of investigating an alleged domestic violence incident. The information Officer Tulagan gathered by asking the question thus cannot support the basis for the search.

Finally, even if Officer Tulagan lawfully departed from the investigative purpose of the stop by asking about probation or parole, the simple assent he received to his question whether Mr. Beltran was on probation or parole did not supply sufficient basis to search Mr. Beltran. That is, simply being told that Mr. Beltran was on probation or parole did not render the following warrantless search reasonable under the Fourth Amendment based on a supposed prior waiver of Fourth Amendment rights.

## VII. ARGUMENT

This Court reviews a district court's denial of a motion to suppress de novo, and the trial court's factual findings for clear error. *United States v. Flatter*, 456

F.3d 1154, 1157 (9th Cir. 2006). "The determination of whether a seizure exceeds the bounds of a *Terry* stop and becomes a de facto arrest is reviewed de novo." *United States v. Torres-Sanchez*, 83 F.3d 1123, 1127 (9th Cir. 1996). "The reasonable suspicion inquiry [under *Terry*] is a question of mixed law and fact, and we review it de novo." *United States v. Manzo-Jurado*, 457 F.3d 928, 934 (9th Cir. 2006). Similarly, the question of whether the detention exceeded its legitimate purpose is also reviewed de novo. *United States v. Washington*, 387 F.3d 1060, 1066 (9th Cir. 2004). In assessing the reasonableness of a search based on a purported Fourth Amendment waiver, appellate courts again "review de novo a district court's denial of a motion to suppress, reviewing for clear error the district court's underlying factual findings." *United States v. Lara*, 815 F.3d 605, 608 (9th Cir. 2016).

## A.   The Officers' Aggressive Handcuffing of Mr. Beltran Amounted to a Full-Blown Arrest Without Probable Cause

Even before they set eyes on Mr. Beltran, the two LAPD officers carefully planned how they would seize him, and discussed the significant—indeed, potentially lethal—amount of force they were prepared to use. They then executed this plan by approaching Mr. Beltran from multiple angles, immediately shouting commands, threatening him, and handcuffing him in the space of moments. "[I]t is well-established that intrusive measures may convert a stop into an arrest if the measures would cause a reasonable person to feel that he or she will

14

not be free to leave after brief questioning." *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009).

### 1. An Arrest Occurs when the Person Seized Would Not Feel Free to Leave and That Continued Custodial Detention is Inevitable

"There is no bright-line rule to establish whether an investigatory stop has risen to the level of an arrest. Instead, this difference is ascertained in light of the 'totality of the circumstances.'" *Green v. City and County of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014) (internal quotations omitted). "[P]hysical restraints[, such as handcuffs] are an important factor in measuring the degree of intrusion." *Id.* "Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996). "In fact, even markedly less intrusive police action has been held to constitute an arrest when the inherent danger of the situation does not justify the intrusive police action." *Id.*; *see, e.g.*, *United States v. Ricardo D.*, 912 F.2d 337, 340–42 (9th Cir. 1990) (arrest occurred when police held suspect in a patrol car for twenty minutes without drawing weapons or handcuffing him); *United States v. Robertson*, 833 F.2d 777, 781–82 (9th Cir. 1987) (arrest occurred where numerous police officers drew guns and detained the suspect, neither handcuffed nor in a police car, for 5–15 minutes); *Kraus v. County of Pierce*, 793 F.2d 1105, 1109 (9th Cir. 1986) (arrest occurred

15

where police used guns and searchlights and ordered suspects to raise their hands and drop to their knees).

In determining whether a seizure crosses the threshold from a *Terry* stop into an arrest, courts look both to whether a reasonable person would feel that he had been placed under arrest, and to whether officers' actions under the circumstances are a "reasonable response to legitimate safety concerns on the part of the investigating officers." *Guzman-Padilla*, 573 F.3d at 884 (quoting *United States v. Miles*, 247 F.3d 1009, 1012–13 (9th Cir. 2001)).  When looking at the objective circumstances known to the detained individual, courts consider whether "a reasonable innocent person in these circumstances would not have felt free to leave after brief questioning," *Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1996) (internal citation omitted)—"i.e., that indefinite custodial detention is inevitable." *Guzman–Padilla*, 573 F.3d at 884.  When looking at the objective circumstances known to police, by contrast, courts look to "the specificity of the information that leads the officers to suspect that the individuals they intend to question are the actual suspects being sought" and "the number of police officers present." *Lambert*, 98 F.3d at 1189–90.  Courts also look to "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Id.* at 1185.

### 2. Officers' Initial Seizure of Mr. Beltran's Person was an Arrest

A reasonable person in Mr. Beltran's situation would not have felt free to leave upon the officers' approach, and would have felt that continued detention was inevitable. Although Brants initially approached Mr. Beltran in what may have appeared to be a calm and respectful manner, this was a ruse. Indeed, the officers' plan involved distracting Mr. Beltran just long enough to grab and handcuff him by surprise, which they did. *See United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990) (use of handcuffs supported that an arrest had occurred). It is unclear from the video (and any other material in the record) whether Mr. Beltran at first even realized who was grabbing his hands and yelling orders at him, since a) Officer Tulagan effectively surprised him and b) it does not appear that Mr. Beltran was able to see Officer Tulagan, who had approached him from the rear. When Mr. Beltran's arms did not immediately go limp upon being grabbed, Officer Tulagan called his partner over to seize Mr. Beltran's other arm, and yelled for half a minute in his ear about the various consequences that might result from anything less than total compliance (including tasing, "getting dropped," getting hurt, new criminal charges, jail, or prison). Tulagan Cam 20:25–21:00.

The government argued below that a reasonable person would not have felt arrested because of Officer Tulagan's intermingled (yelled) concessions that his threats would not be made good if Mr. Beltran were a) innocent and/or b) completely and instantly compliant. (ER-208.) However, as the government

17

correctly conceded below, such intermingled concessions are just one factor in a totality-of-the-circumstances analysis. *See United States v. Bravo*, 295 F.3d 1002, 1011 (9th Cir. 2002) ("[A]n officer cannot negate a custodial situation simply by telling a suspect that he is not under arrest."); *see also United States v. Lee*, 699 F.2d 466, 467 (9th Cir.1982) (per curiam) (finding that defendant was in custody even though agents told him he was "free to leave"). Here, Mr. Beltran can hardly have been expected to carefully weigh, let alone credit, these statements by Officer Tulagan, given the other statements surrounding them, the tone, volume, and distance at which they were delivered, and the physical circumstances into which Mr. Beltran had abruptly and unexpectedly been placed.

The amount of force used by the officers was also grossly excessive and disproportionate relative to the anodyne circumstances the officers faced. The officers knew only that a witness had described a physical altercation between two people whose appearance was in certain ways consistent with that of Mr. Beltran and Ms. Salvador: a man and a woman, with the man in a gray shirt and the woman in a dress. (ER-222.) But more significant aspects of the description contradicted Mr. Beltran and Ms. Salvador as suspects: the caller had described the woman as covered in blood, but Ms. Salvador had no visible blood on her and did not appear to be in distress. Whereas the caller had described the male as wearing a striped shirt and shorts, Mr. Beltran's shirt and shorts were not striped. The caller had not described any masks, but both Mr. Beltran and Ms. Salvador

18

were wearing masks. And while the caller had not mentioned the woman was disabled or unable to walk, Ms. Salvador was sitting in a motorized cart so as to appear to need walking assistance. And, while the caller had described the man as white, Mr. Beltran is (and appears to be) Hispanic.[7] Perhaps most importantly, while the caller had described the couple as fighting, neither Mr. Beltran nor Ms. Salvador were even raising their voices. And the call had occurred over seven minutes earlier; undermining its reliability as to the couple's location. Nevertheless, Officer Tulagan—without even setting eyes on the couple—planned out various scenarios with his trainee partner in advance, all involving the immediate forceful restraint of Mr. Beltran. *See, e.g.*, Tulagan Cam 17:20–17:22, 17:32–17:45, 19:44–19:58. Indeed, mere seconds before encountering Mr. Beltran, Officer Tulagan was giving his trainee partner advice about how to discharge his firearm at Mr. Beltran. *Id.* at 19:44–19:58.

"[T]he specificity of the information that" led the officers to suspect Mr. Beltran "[was] the actual suspect[] being sought" further indicates an arrest and not just a stop occurred. *Lambert*, 98 F.3d at 1189–90. "[T]he more specific th[at] information . . . the more reasonable the decision to take extraordinary measures to ensure the officers' safety." *Id.* at 1190. Here, the officers' information was far

---

[7] Mr. Beltran stated below that he "is Hispanic and appears Hispanic, not white," and the government did not contest or controvert this assertion. (ER-267.)

too vague to justify immediate, aggressive, planned physical seizure and handcuffing, to include possible use of firearms, before any on-scene investigation had been done at all. The officers had just one person's description of a fighting couple. Although that person was not anonymous, officers had not questioned that person themselves, and it was entirely possible that more than one couple wearing similar clothes might be found in the grocery store. And the correspondence between Mr. Beltran's and Ms. Sandoval's appearance and the caller's description was highly inexact at best—and wholly inconsistent at worst— given the face masks the two were wearing, the mismatch to Mr. Beltran's ethnicity and clothing description, and the motorized cart in which Ms. Salvador was sitting (which was never mentioned even by the person who reported seeing them in the store). It was the government, not Mr. Beltran, that had the burden below to prove the officers had reasonable suspicion to suspect Mr. Beltran was the suspect described in the calls. *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) ("The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government."). But the numerous contradictions between the caller's description and Mr. Beltran's and Ms. Salvador's appearance show it failed to meet that burden.

Most importantly, the officers lacked any reason to think Mr. Beltran was armed and dangerous. Nothing in the tip they had received suggested the man they sought was armed, had threatened bystanders, or was likely to be aggressive with

police.  Nor did Mr. Beltran appear to have a weapon when they approached him. Immediately seizing and handcuffing Mr. Beltran constituted exceedingly intrusive measures, of this type this Court has only allowed "in special circumstances" far afield from those here, such as "where the suspect is uncooperative or [his acts] raise[] a reasonable possibility of danger or flight," "the police have information that the suspect is currently armed," "the stop closely follows a violent crime," or "where the police have information that a crime that may involve violence is about to occur." *Lambert*, 98 F.3d at 1189 (footnotes omitted).

None of those criteria are met here. The officers had no reason to believe Mr. Beltran would be uncooperative,  information that Mr. Beltran was currently armed, or reason to believe a crime of violence was imminent as the couple peacefully shopped in the grocery store.  Nor do these facts resemble those in cases where this Court has found no arrest due to suspects' indications of danger, such as leading police on a high speed chase while drunk, *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995), or demonstrating intent to commit an armed bank robbery.  *United States v. Thompson*, 906 F.2d 1292, 1294 (8th Cir. 1990).  The officers here had only vague information about a routine, suspected domestic violence incident.  It is not plausible to suggest such commonplace facts automatically warrant physical search and seizure; nor did the government attempt to argue as much below.

### 3. The Arrest Was Illegal Because It Lacked Probable Cause

"There is probable cause for a warrantless arrest . . . if, under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime." *United States v. Gonzales*, 749 F.2d 1329, 1337 (9th Cir.1984). "[P]robable cause 'demands' factual 'specificity' and 'must be judged according to an objective standard.'" *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (quoting Terry, 392 U.S. at 21–22 n.18).

Whether or not officers' information, received by tip, was sufficient to amount to reasonable suspicion, discussed in Section VII(B) below, it did not amount to probable cause to conduct an arrest on the spot. All officers had was a description of an alleged domestic violence incident between two people who shared certain rough characteristics with the caller's description, but contradicted it in other ways. As Officer Tulagan himself stated while seizing Mr. Beltran, significant further investigation would be required to develop probable cause, including interviewing both parties and speaking further to the witness who claimed to have seen the altercation. Most tellingly of all, perhaps, after this investigation was conducted, the officers did not believe probable cause existed to charge a domestic assault, and no such assault was charged. *See* (ER-242.)

22

**B.    The Officers' Seizure and Subsequent Search of Mr. Beltran Was Conducted Without Requisite Reasonable Suspicion or Officer Safety Concern Under *Terry v. Ohio***

Even if Mr. Beltran was not immediately placed under arrest, as argued above, he was at least detained and then frisked within the meaning of *Terry v. Ohio*, 392 U.S. 1 (1968).  Because neither the initial warrantless seizure nor the immediately subsequent frisk were justified under *Terry*, they violated the Fourth Amendment.

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures" by the government.  U.S. Const. amend. IV.  *Terry v. Ohio* permits limited police intrusions on a person's freedom of movement and personal security when an officer's suspicion falls short of the probable cause required to execute an arrest or a full search.  *See* 392 U.S. 1, 20–27 (1968).

As the district court recognized, *Terry* authorizes a brief detention for investigative purposes under some circumstances, and authorizes a search, or so-called "*Terry* frisk," for the different purpose of officer safety.   "Whereas the purpose of a *Terry* stop is to further the interests of crime prevention and detection, a *Terry* frisk is justified by the concern for the safety of the officer and others in proximity." *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016) (internal citation omitted), as amended (May 5, 2016).  But neither set of concerns justified the officers' seizure and frisk of Mr. Beltran under the facts of this case.

23

### 1. The Officers Lacked Reasonable Suspicion to Seize and Handcuff Mr. Beltran.

The government has never disputed that Mr. Beltran was seized within the meaning of *Terry* when Officers Tulagan and Brants grabbed and handcuffed him. *See United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) (handcuffing defendants for investigatory purposes was *Terry* seizure). The question is therefore whether this seizure was justified by reasonable suspicion. It was not.

To effectuate such a *Terry* seizure an officer must have at least reasonable suspicion to believe "criminal activity may be afoot." *Terry*, 392 U.S. at 30; *United States v. Arvizu*, 534 U.S. 266, 273 (2002). This means the officer must have reasonable suspicion "the person apprehended is committing or has committed a criminal offense." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry*, 392 at 21. "Whether reasonable suspicion exists depends upon the totality of the circumstances surrounding the stop, including 'both the content of information possessed by police and its degree of reliability.'" *United States v. Williams*, 846 F.3d 303, 308 (9th Cir. 2016) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). "Both factors—quantity and quality [of the officers' information]—are considered in the totality of the circumstances." *White*, 496 U.S. at 330 (internal citation and quotation marks omitted). "Thus, if a tip has a relatively low degree of

reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.*

Those requirements are not met here. As an initial matter, the officers' observations of Mr. Beltran in the Food 4 Less gave them no reason to suspect he "[was] committing" a crime. *Arizona v. Johnson*, 355 U.S. at 326. Although the officers scarcely took the time to observe what was happening as they approached Mr. Beltran and Ms. Salvador, body camera footage makes clear that the two were standing on opposite sides of a shopping cart, perhaps talking but in any event not engaging in any visible act of domestic violence or any other illegal activity. *See* Tulagan Cam 19:58–20:13; Brants Cam 18:43–18:55.

Nor did the facts the officers learned before entering the store give them reasonable suspicion to support the *Terry* stop; and the district court erred in concluding the contrary. Before entering the Food 3 Less, the officers were aware of an anonymous tipster who they thought they had identified on scene and who had stayed in touch with police. But that tipster's information suffered from two notable problems.[8] *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) ("[A]n

---

[8] When dealing with anonymous tips, the Supreme Court has identified five important factors: (1) whether the tip indicates eyewitness knowledge of the incident; (2) whether the tip was made contemporaneously with the incident; (3) whether the tip was provided via the 911 emergency system and whether that system had features that allowed for identifying and tracing callers; (4) whether the tip contained predictive information about the person's activity that was not otherwise easily predictable; and (5) whether officer observation confirmed that

anonymous tip seldom demonstrates the informant's basis of knowledge or veracity." (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990))); *see also Brown v. United States*, 590 A. 2d 1008, 1015 (D.C. Cir. 1991) ("[C]ourts are properly wary of sustaining seizures on the basis of anonymous tips.").

First, the tipster does not appear to have seen the people he was watching enter the Food 4 Less. (ER-232.) Although the tipster saw them walking toward the Food 4 Less parking lot, he does not appear to have seen them actually go inside. The other person in the parking lot who directed officers toward the Food 4 Less seems not to have been the same person as the caller, because the caller described himself as wearing a "full grey shirt and sandals," but the other person was wearing sneakers. Moreover, both the caller and the person in the parking lot were completely anonymous and unknown to the officers, who had no idea what the basis of the caller's knowledge was. *See* Tulagan Cam 16:30–16:35.

Second, the caller's description failed to match either Ms. Salvador or Mr. Beltran. As to Ms. Salvador, the tipster described the woman he saw as "completely bloodied," (ER-226), while Ms. Salvador's face showed no blood or other signs of injury. Tulagan Cam 19:58–20:13; Brants Cam 18:43–18:55. And while the caller said nothing about the woman needing assistance walking, Ms.

---

predictive information. *Navarette v. California*, 572 U.S. 399–400 (2014). Because the *Navarette* factors are concededly largely met here, Mr. Beltran's analysis focuses on the specific shortcomings in the tip discussed herein.

26

Salvador was riding in a motorized cart. Mr. Beltran was also not a match in several ways. The caller described the suspect as a white man of about 24 wearing striped clothing, whereas Mr. Beltran was Hispanic, wore a shirt with logos not stripes, and the officers could not determine his age because his face was covered by a mask and he was turned away from them when approached. *See* section VII(A)(2), above.

More fundamentally, the description was generic enough to make it reasonable to assume it would approximately match more than one couple with a male party in the Food 4 Less. At the very least, officers were under an obligation to further investigate before conducting such a forceful seizure. *See United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1298 (9th Cir.1988) (anonymous tip did not establish probable cause where police easily could have taken steps to corroborate the tip). And, as discussed below in Section VII(B)(2), there was little objective basis for officers to be concerned for their own safety or the safety of others.

### 2. Officers Were Not Justified in Conducting a *Terry* Frisk, Pat-Down, Or Search Based on Officer Safety Concerns

The officers also lacked sufficient concern for their safety to justify a *Terry* frisk. Officer Tulagan stated after grabbing Mr. Beltran "We're just gonna pat you down, is that cool, just to make sure you got nothing on you?" Tulagan Cam 18:55–19:00. He proceeded to search Mr. Beltran's waistband. Although this

search was ostensibly also occasioned by Officer Tulagan's questioning about probation and parole, discussed in sections VII(C) and (D) below, it was a) not supported by the results of that questioning, as discussed below, and b) not independently justified by any concerns for officer safety arising out of a so-called *Terry* frisk.[9]

"[W]hereas a *Terry* stop is justified by reasonable suspicion that criminal activity may be afoot, a frisk of a person for weapons requires reasonable suspicion that a suspect 'is armed and presently dangerous to the officer or to others.'" *Dillard*, 818 F.3d at 875–76 (quoting *Terry*, 392 U.S. at 24). "A lawful frisk does not always flow from a justified stop." *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir.1988). Each aspect of the stop requires separate analysis, and must independently be supported by appropriate reasonable suspicion. *Dillard*, 818 F.3d at 876. Courts must assess the totality of the circumstances for specific, objectively ascertainable facts and determine if "a reasonably prudent [person] would have been warranted in believing [the suspect] was armed and thus

---

[9] The district court's reasoning on this score in denying the motion to suppress was unpersuasive. The district court concluded that because in direct response to Officer Tulagan's probation-or-parole questioning, Mr. Beltran stated he had a gun, the search was justified on that basis. (ER-39, 40.) However, as explained herein, the questioning, search, and the evidence uncovered thereby were the fruit of multiple independent Fourth Amendment violations: an illegal arrest, an illegal *Terry* stop, an illegal *Terry* frisk, and an illegally prolonged search and seizure. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

28

presented a threat to the officer's safety while he was investigating his suspicious

behavior." *Terry*, 392 U.S. at 28.

> In assessing the totality of the circumstances, relevant considerations may
> include:  observing a visible bulge in a person's clothing that could indicate
> the presence of a weapon; seeing a weapon in an area the suspect controls,
> such as a car; sudden movements suggesting a potential assault or attempts
> to reach for an object that was not immediately visible; evasive and
> deceptive responses to an officer's questions about what an individual was
> up to; unnatural hand postures that suggest an effort to conceal a firearm;
> and whether the officer observes anything during an encounter with the
> suspect that would dispel the officer's suspicions regarding the suspect's
> potential involvement in a crime or likelihood of being armed.

*Dillard*, 818 F.3d at 877 (internal citations omitted) (cleaned up).

Here, officers observed no facts on the scene before seizing Mr. Beltran that

created a reasonable suspicion he was armed or a danger to them.  Indeed, they

planned to seize him before even laying eyes on him, and did so the instant they

saw the person they thought they were looking for.[10]  Officer Tulagan grabbed Mr.

---

[10] Tulagan claimed in his declaration:

I noticed that Beltran showed signs of being under the influence of a
controlled substance and looked like he was going to flee. I thought Beltran
was going to flee because he turned his head. Beltran also showed the
following two objective signs of being under the influence of a controlled
substance: he was tense and agitated.

(ER-253.)  However, this is not credible or a reasonable inference from the facts
known to Tulagan, and the district court made no findings that this specific
observation was credible.  As visible in Brants's body camera, Mr. Beltran "turned
his head" toward Brants to respond to his questioning.  If Mr. Beltran was "tense
and agitated," this was far more likely, to a reasonable officer, to have been a

Beltran before Mr. Beltran could even see Officer Tulagan, and indicated at that time that it was Officer Tulagan's intent to pat Mr. Beltran down for weapons. Tulagan Cam 18:55–19:00. Because the facts underlying a *Terry* frisk must be known to the officers at the time of the frisk, any basis for a *Terry* frisk here is limited to the facts the officers knew before frisking Mr. Beltran.

All officers knew was that they were investigating a potential domestic violence incident involving people who matched certain generalized elements of Mr. Beltran's and Ms. Salvador's description. But "the mere fact an officer is responding to a perceived domestic violence call" fails to "establish[] reasonable suspicion a suspect is armed and dangerous" under *Terry*, especially given the broad scope of California domestic violence law. *See Dillard*, 818 F.3d at 879; *see also United States v. I.E.V.*, 705 F.3d 430, 433, 435 (9th Cir. 2012) (*Terry* frisk was not justified where defendant had been removed from car where drug dog alerted). If anything, the information officers possessed weighed *against* any conclusion that their safety was at risk: the caller did not mention any weapon, Ms. Salvador did not appear bloodied or distressed, and Mr. Beltran was separated from Ms. Salvador by a shopping cart. And the officers themselves were armed, outnumbered Mr. Beltran, and were approaching him in a public and well-lit

---

consequence of suddenly being seized from behind while shopping than being "under the influence of a controlled substance."

grocery store during daylight hours.  There was no basis in specific, articulable

facts to believe that the safety of officers or anyone else required a search of Mr.

Beltran's person for weapons.

**C.**    **Officer Tulagan's Questioning About Whether Mr. Beltran Was On Probation or Parole Exceeded The Permissible Scope of The Investigation and Illegally Prolonged the Seizure**

Even if the initial detention of Mr. Beltran is assumed to have been lawful, a

seizure "can violate the Fourth Amendment if its manner of execution

unreasonably infringes interests protected by the Constitution." *Illinois v.*

*Caballes*, 543 U.S. 405, 407 (2005).  In *Rodriguez v. United States*, 575 U.S. 348

(2015), the Supreme Court held that for a *Terry* stop, the "tolerable duration of

police inquiries . . . is determined by the seizure's mission." *Id.* at 348 (internal

quotation omitted).  Tasks not related to the seizure's mission, and that prolong the

stop beyond the time reasonably necessary to complete that mission, are unlawful

unless supported by independent reasonable suspicion. *Id.* at 349.

Here, the officers' mission was to investigate whether a crime of domestic

violence had recently occurred between Mr. Beltran and Ms. Salvador.  Such

inquiries might involve asking the two their names, asking them what had been

going on shortly beforehand, separating the two suspectedly involved each other.

*Cf.* (ER-251) (describing the "best practices" involved in a domestic violence

investigation).  But the officers' investigation had barely begun before Officer

Tulagan asked Mr. Beltran whether he was "on probation or parole."  This question

31

had no bearing on the mission of investigating domestic violence. *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015). And it prolonged the stop beyond the time reasonably necessary to complete the mission of determining whether Mr. Beltran and Ms. Sandoval had been involved in an incident of domestic violence.

Indeed, Officer Tulagan's declaration made clear that the questioning had *no* particularized relation to his investigation of the supposed domestic violence incident, because he asks it in every case for the asserted purpose of "ensur[ing] my safety and the safety of others." (ER-252.) This activity was not "fairly characterized as part of the officer's . . . mission," but instead was "aimed at detect[ing] evidence of ordinary criminal wrongdoing." *Rodriguez*, 575 U.S. at 356, 355.

The district court assumed without any analysis that this diversion from the primary purpose of the investigation was permissible, even though Mr. Beltran squarely raised this issue in his initial motion to suppress. *See* (ER-271.) But this was error. In *United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019), this Court held that "[a] demand for a passenger's identification is not part of the mission of a traffic stop" because "[t]he identity of a passenger . . . will ordinarily have no relation to a driver's safe operation of a vehicle." *Id.* at 868. Similarly, a request to determine whether a person is on probation or parole is unrelated to whether a person has committed a crime of domestic violence. Officer Tulagan, rather, like the officer in *Landeros*, asked the question because it is his "standard practice," not

32

because he was determining whether Mr. Beltran had committed a crime. (ER-252); *Landeros*, 913 F.3d at 868. The questioning was a task unrelated to the mission of the trespass stop and could occur "only if the officer ha[d] reasonable suspicion of an independent offense."[11] *Landeros*, 913 F.3d at 867. But the officers here did not.

Because Officer Tulagan did not have independent reasonable suspicion to justify the questioning related to probation or parole, and this task prolonged the stop, that extension violated the Fourth Amendment.

**D. Mr. Beltran's "Yes" Answer to the Question Whether He was On Probation or Parole was Insufficient Basis for Police To Conduct a Reasonable Search On the Belief He Had Waived His Fourth Amendment Rights**

Officer Tulagan asked Mr. Beltran if he was on "probation or parole" immediately after Mr. Beltran had been handcuffed. Tulagan Cam 21:15–21:30. Mr. Beltran replied "yes," and, when asked what for, stated "a gun." *Id.* The subsequent search of Mr. Beltran's person was unjustified as a search based on probation or parole status, however, because officers' knowledge of any search term or condition that might apply (the record is silent whether one did apply) was

---

[11] An "independent offense" justifying questioning about probation or parole status would presumably ordinarily be a legitimate topic of inquiry of an officer had some reason to believe that a person was violating or had violated their probation or parole.

insufficient to support a reasonable belief that Mr. Beltran had waived his right to be free from searches or seizures that violate the Fourth Amendment.[12]

A person on probation or parole can waive his Fourth Amendment protections from search and seizure as a condition of that probation or parole. *See United States v. Scott*, 450 F.3d 863, 865 (9th Cir. 2006) (explaining such waiver in the pretrial release setting). However, "[p]olice officers must *know about* a probationer's Fourth Amendment search waiver before they conduct a search in order for the waiver to serve as a justification for the search." *United States v. Job*, 871 F.3d 852, 859 (9th Cir. 2017) (added emphasis); *see also, e.g.*, *United States v. Garcia*, 974 F.3d 1071, 1080 (9th Cir. 2020) (referring to requirement that officers have "knowledge of the search condition in advance"); *United States v. Caseres*, 533 F.3d 1064, 1075–76 (9th Cir. 2008) (stating that California parole-search condition "validates a search only if the police had advance knowledge that the search condition applied before they conducted the search"). In other words, "[a] Fourth Amendment search waiver cannot provide a justification for a search of a probationer where the officers were unaware of the waiver before they undertook the search." *Job*, 871 F.3d at 859.

---

[12] Mr. Beltran recognizes that he stated immediately afterward that he had a gun on his person. The argument in this Section is directed only toward the question whether officers developed a freestanding and independently sufficient basis for search based upon what they knew about his probation or parole status.

In addition, even if a search term exists, the government bears the burden of showing that any search or seizure conducted under its terms is a) reasonable and b) undertaken within the scope of those terms. *See Lara*, 815 F.3d 605, 609–10 (holding that warrantless search of probationer's cell phone was unjustified, even though police knew of his probationary status, based on the limited surrender of privacy interests involved in being on probation and the similarly limited interest of the government in searching the phone).

Here, the vague information Tulagan possessed about Mr. Beltran's probation or parole status—the answer "yes" to whether he was on probation or parole and the added information that it was for "a gun"—was insufficient to render search reasonable. First, Officer Tulagan did not know even if Mr. Beltran was on probation or parole (his question was phrased in the disjunctive).[13] Second, whatever form of court supervision Officer Tulagan might have believed Mr. Beltran to be on, he did not have specific knowledge of a search condition, or even knowledge whether such a condition existed. Third, had it been reasonable to infer the existence of such a term, Officer Tulagan's knowledge of that imagined term

---

[13] Officer Tulagan appears to have optimistically assumed parole was meant. His declaration, submitted later, reflects a false belief that Mr. Beltran stated he was on parole: "During our investigation, Beltran told us that he was on parole. In my training and experience, parole status results from felonies only (not misdemeanors). Through my training and experience, I know that parolees are subject to search and seizure procedures." (ER-253.)

was insufficient to render search reasonable. Fourth, even if Mr. Beltran had been correct about having been on probation or parole at some point in time, his hasty response to interrogation under the circumstances was insufficiently reliable as to whether Mr. Beltran was *then* still on probation or parole. In sum, whatever Officer Tulagan did know or think he knew about Mr. Beltran's probation or parole status and the terms it might have, that knowledge was insufficient because he did not have knowledge of a search condition that applied to Mr. Beltran before conduct a search. *See Garcia*, 974 F.3d at 1080; *Caseres*, 533 F.3d at 1075–76.

In addition, the government did not meet its burden to show that Mr. Beltran was actually on probation or parole and that his probation or parole contained a search terms whose scope reasonably authorized the search Officer Tulagan conducted. *See Lara*, 815 F.3d 609–10. Because the government cannot meet its burden to show that a warrantless search was reasonably authorized by a specific search condition known at the time to Officer Tulagan, Mr. Beltran's purported waiver of his Fourth Amendment rights cannot stand as a basis authorizing officers' search.

36

## VIII. CONCLUSION

This Court should reverse the district court's denial of the motion to suppress and remand for further proceedings.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: March 20, 2023          By  */s/ Samuel O. Cross*
                                  SAMUEL O. CROSS
                                  Deputy Federal Public Defender
                                  Attorney for Defendant-Appellant

## INDEX OF ADDENDUM

U.S. Const. amend. IV ......................................................................... A1

Case: 22-50179, 03/20/2023, ID: 12677960, DktEntry: 12, Page 47 of 49

Amendment IV. Searches and Seizures; Warrants, USCA CONST Amend. IV-Search...

United States Code Annotated
   Constitution of the United States
      Annotated
         Amendment IV. Searches and Seizures; Warrants

U.S.C.A. Const. Amend. IV-Search and Seizure; Warrants

Amendment IV. Searches and Seizures; Warrants

Currentness

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

&lt;Historical notes and references are included in the full text document for this amendment.&gt;

&lt;For Notes of Decisions, see separate documents for this amendment.&gt;

U.S.C.A. Const. Amend. IV-Search and Seizure; Warrants, USCA CONST Amend. IV-Search and Seizure; Warrants
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**                                 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF RELATED CASES

Counsel for appellant certifies that he is unaware of any pending case presenting an issue related to those raised in this brief.


DATED: March 20, 2023                                     */s Samuel O. Cross*
                                                          SAMUEL O. CROSS

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this

opening brief is proportionally spaced, has a typeface of 14 points or more, and

contains approximately 9,237 words.


DATED: March 20, 2023     */s Samuel O. Cross*
              SAMUEL O. CROSS